No. 28,967.

THE AUGUSTA BUILDING AND LOAN ASSOCIATION, *Appellee*, v. ED-
MUND F. SPECK et al., *Appellees,* and THE LONG-BELL LUMBER
COMPANY, *Appellant.*

(285 Pac. 516.)

Opinion filed
March 8, 1930.

*L. J. Bond,* of El Dorado, *Baker, Botts, Parker & Garwood,* of Kansas City,
Mo., for the appellant.

*M. A. Merten,* of Augusta, and *K. M. Geddes,* of El Dorado, for the appellee.

The opinion of the court was delivered by

HUTCHISON, J.: This is a mortgage foreclosure action brought
by a building and loan association against the record owner of a lot
in Augusta, Kan., on which a "home beautiful" had been recently
built, and ten other individuals, partnerships and corporations fur-
nishing material and equipment for the construction of the building
thereon.

The appeal is by one of the defendants, the Long-Bell Lumber
Company, a corporation of Missouri, which maintains a lumber yard
in Augusta, Kan., and furnished lumber for the construction of the
building. The appeal is from the finding and judgment of the trial
court denying the lumber company a lien on the property.

The pleadings put in issue the questions of the existence of, and
right to, a mechanic's lien, and also the question of the same having
been waived by the lumber company. The trial court made ex-
tensive findings of fact and conclusions of law and rendered judg-
ment for the building and loan association on its mortgage, and de-
nied the right of each and all the materialmen, including the Long-

Bell Lumber Company, to liens under the mechanic's lien statute, one of the findings being that the local manager of the lumber company did not have authority from the lumber company to waive the right of the company to a mechanic's lien as he had attempted to do. This latter question is fully abstracted and briefed in this appeal, but as there is no cross appeal that question is not properly here for consideration, except as it is in some instances inseparably connected with the other question in the testimony and findings.

The plaintiff in its petition alleges that the lumber company was one of the coöperators engaged in the advertising scheme of building the "home beautiful," and its local manager, Edmund F. Speck, was elected by all of them to take the title to the lot in his name and execute the mortgage to the building and loan association to secure sufficient funds to purchase the lot and defray the labor bills in the erection of the building. The defendant Long-Bell Lumber Company in its answer denies that it ever entered into any coöperative arrangement with the other materialmen and that its local manager, Edmund F. Speck, was ever authorized to enter into such an arrangement, and alleges that it did enter into a verbal contract with Edmund F. Speck and the materialmen and the plaintiff building and loan association to furnish them lumber and building material for the construction of the building on the lot in question, and to its answer is attached a copy of the statement for materialman's lien duly filed by it, in which it refers to the other materialmen and the building and loan association as the beneficial owners of the property, and Speck as the record owner thereof.

Finding No. 3 of the trial court gives the names of the materialmen and the materials which they furnished, ten in all. The list includes the Long-Bell Lumber Company, and finding No. 17 gives the value of the material so furnished by each of them. Finding No. 4 gives the description of the lot on which the "home beautiful" was constructed.

The following other findings of fact and conclusions of law made by the trial court are particularly pertinent to the question involved herein:

"Second. Edmund F. Speck is the local manager at Augusta for a lumber yard owned by the Long-Bell Lumber Company.

"Fifth. About the first part of June, 1927, said Dan came to Augusta and interested the Augusta *Gazette* in a project to construct what is commonly called 'a house beautiful.' This project included the formation of an associa-

tion of dealers in an understanding whereby such dealers and associates would agree to procure real estate for the erection of a dwelling house thereon, each dealer to furnish for use in constructing and equipping said house such materials and equipment as were sold or handled by such dealer and to furnish them at cost plus a reasonable handling charge, said real estate and dwelling and all furnishings and equipment to belong to said dealers. The laborers, a part of the real-estate cost and other items of expense not furnished by said dealers to be paid for from funds to be obtained from a first mortgage on real estate and improvements, said building when completed to be opened to public inspection for a few days, the dealers to advertise and display the wares so furnished by them. The management of said enterprise to be in control of said dealers, but for convenience they to choose an agent as chairman, manager or trustee to handle said project. That said real estate and building and furnishings should be later sold under the direction of said dealers to the highest sealed bid and the proceeds over and above the mortgage should be divided among said dealers, and those contributing to said project as members of said association, in payment of their accounts and the amounts contributed by them, in proportion to their respective accounts. If there was a loss they to share the loss in the same proportion, and if a profit it should be divided in the same way.

"Sixth. In June, 1927, certain dealers and others held several informal meetings at which this project was discussed. Not all of the same persons were present at all of the meetings and no records were kept. At one of these meetings Edmund F. Speck was chosen as an agent or trustee for those who desired to associate themselves in said project as contributors of materials, real estate, furnishings and equipment and other expense necessary in the construction of said 'house beautiful.' Said persons and corporations so associating themselves together were referred to as 'coöperators,' as 'creditors' and as 'trustees.' The following-named persons, partners and corporations, either at said meetings in June, 1927, or within a short time thereafter, to wit: W. A. Hall, Ledbetter & Son, the Long-Bell Lumber Company, Govenius Brothers, R. L. Wilday, the Western Distributing Company, Haaga & Graham, Roy A. Haines, the Prairie State Bank, and Jackson-Drake Furniture Company orally agreed with each other to associate themselves together in the carrying out of said project in substantially the form and under the terms and conditions set forth in the preceding finding, and this finding.

"Eighth. The duties of said Edmund F. Speck as the local manager of said lumber yard for the Long-Bell Lumber Company, among other things, were to receive building materials shipped to said yard, to sell such materials at retail, either for cash or credit as his judgment might dictate, to make collections, hire helpers, to do some local advertising, solicit business, to change prices within certain limits fixed by the company, to account and report to the company.

"Ninth. . . . The secretary later and before accepting the application told Speck that he must hold the title as an individual and not as a trustee, and also that all of the dealers and others who were going to be interested in the project would have to sign a written waiver of the right to a mechanic's

lien and asked Speck if he had authority as agent of the Long-Bell Lumber Company to waive a lien on its behalf. Speck told the secretary that he did not have such authority, but would phone to the general office and find out whether his company would consent to waive its lien rights. Speck thereupon called J. H. Foresman, the first vice president of the company at Kansas City, by phone, explained to him that said dealers were building a 'home beautiful' in Augusta, the nature of the project, and that his company had been asked to furnish the lumber and other materials at cost plus a reasonable handling charge, and asked if it would be all right for him to join with the other dealers in behalf of the lumber company in the project. After some discussion about the advertising benefits and after they had estimated the company's probable loss would be from $50 to $100, the vice president orally authorized Speck to associate the company with the other dealers in carrying out said project. There was nothing said between Speck and Foresman about the company waiving its rights to a lien. Thereafter Speck orally agreed on behalf of said company to associate with the other dealers in said project and in good faith, and believing he had been authorized to waive a lien, so informed the secretary of the plaintiff association, and Speck signed the waiver on behalf of the company as attached to plaintiff's petition. The deed made to Speck as trustee was returned to Haines, and on July 9, 1927, Haines executed a new deed to Speck individually, all of the written waivers of liens as attached to plaintiff's petition were presented to the secretary of the plaintiff association, said application was accepted, and on July 9, 1927, Speck and wife executed the note for $2,500, and a mortgage securing the same, to the plaintiff upon the real estate described herein . . .

"Twelfth. None of the members of said dealers' association, except the plaintiff and the Long-Bell Lumber Company, had any actual notice or knowledge that said Edmund F. Speck did not have actual authority as such local manager to agree on behalf of said company to waive the right to a lien in its behalf.

"Nineteenth. Said Speck did not have actual authority from the lumber company to waive the right of the company to a mechanic's lien.

"Twentieth. At the time said land was conveyed to Speck and at all other times, neither said Speck nor any of the members of said association had any fraudulent intent, and it was orally agreed by and between Speck and between each of said members that the title to said land was to be taken in the name of and held by Speck as the agent of and in trust for such members to the extent that each contributed to the project of acquiring said land and erecting said dwelling and disposing of the same. Speck does not now and never has made any claim to said real estate, except his claim to an equitable lien to secure him for the money he advanced to pay for labor."

"Conclusions of Law.

"Fifth. The members of said association of dealers as hereinbefore found and named by the court are the equitable owners of said real estate and all of the improvements, furnishings and equipment, and all of said property is now subject to sale. None of the members of said association are liable to each other in any sum or on any account set up in the pleadings, none of them are

entitled to a mechanic's lien and each and all of the mechanics' liens sought to be foreclosed are null and void and not entitled to foreclosure.

"Sixth. As between the members of said association said alleged waivers of mechanics' liens set up in the pleadings are of no force or effect.

"Tenth. Under the authority given to Speck by the lumber company and as its local manager of the Augusta yard, the lumber company held said Speck out to the world as authorized to act for it in the furnishing and selling of materials from said yard to the public, and the members of said dealers' association were justified in believing that said Speck was authorized to make the agreement that the court finds he did make, and the lumber company would have been bound by such agreement even though the company had not specifically authorized him to make such agreement."

One of the paragraphs of the journal entry of judgment is as follows:

"That each and all of the other defendants herein [i. e., except Speck] are the equitable owners in the ratio that their respective claims as found herein bear to the whole amount of their claims, subject only to .the liens of the plaintiff and Edmund F. Speck, to be paid from the proceeds of any sale of said premises; but that they are entitled to no other relief."

The following is part of the testimony of Edmund F. Speck:

"I have been acting for the Long-Bell Lumber Company as local manager at Augusta, Kan., for the past four years. I handle their business there and sell lumber and materials, and make contracts for the sale of them. I handle all the duties incidental to the business there that come in my scope. In July, of 1927, I was approached by Mr. Hegler and Mr. Sol Dan in regard to the 'home beautiful' project.

"Premiums and blue prints were shown me by Mr. Wilday, and I was asked to furnish the materials. I met with the representatives of the Western Distributing Company, Ledbetter & Son, Govenius Bros., of Jackson and Drake, and with Mr. Hegler, of the Augusta Gazette, and Sol Dan, the promoter. I was selected at the meeting to act as chairman.

"The general plan was talked over at one of the meetings, and it was agreed that each merchant was to furnish materials at cost, plus a reasonable handling charge. After the house was completed, it was to be opened to the public, and then sold to the highest bidder. I was to take title of the property in my name and after the property was sold the building and loan was to receive their dollar for dollar they put into the project, and the remainder was to be divided among the coöperators in proportion to the amount they had put in.

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .

"After this transaction came up I had a conversation over the phone with Mr. Foresman, general manager of the retail yard division of the Long-Bell Lumber Company, concerning this transaction. I told Mr. Foresman that they were planning on building a model home in Augusta, and that they had come to us, inviting us to furnish the material to go into this proposition, at cost plus a reasonable handling charge, and I wanted authority to sell that material.  .  .  .  None of the details of the transaction as to how it was to

be financed were discussed between me and Mr. Foresman in that conversation or at any other time. I told Mr. Foresman that they wanted the Long-Bell Lumber Company to furnish material on a cost-plus basis. He told me that the company was willing to do that if we didn't have more than a fifty- or one-hundred-dollar loss in the proposition. I told him I thought we would have approximately that much, but it looked like a good advertising proposition. . . .

"I hold title to the property in trust for the group of coöperators, Haaga and Graham, W. A. Hall, the Western Distributing Company, Govenius Brothers. We talked together about holding the property in trust in my name for all of them. If there was any profit made it would belong to those mentioned, so as agent of the Long-Bell Lumber Company I sold this material to myself as trustee for these parties."

The following is part of the testimony of J. H. Foresman, general manager of the retail yard division of the Long-Bell Lumber Company, whose office is in Kansas City, Mo.:

"That Mr. Speck called him over the phone in the early part of July and put up the proposition that they were going to build a 'home beautiful' down there and that the Long-Bell Lumber Company had been selected as the concern from whom they wanted to get the material on a basis of cost plus ten per cent. 'He knew it would cost us 10 per cent to do business and that we would be delivering this material without any profit.' When I asked him why he wanted to do that he said it was a good advertising proposition. I asked him how much it would cost as an advertising proposition. He studied a minute and said fifty or one hundred dollars. I asked him if he thought it would be worth it, and he said it would. I told Mr. Speck we did not like to take the chance, but we would back his judgment, and he could go along with it if he liked. He did not say anything about waiving lien rights of the Long-Bell Lumber Company, or about giving or making a mortgage on the property. Mr. Speck did not make any explanation of the details or of the financing of the proposition and we didn't think that was necessary because he had his instructions. Nothing was said about the other merchants and materialmen being in and we had no knowledge of the details of the transaction. I supposed there would be other merchants in it, but I didn't understand that the hardware men and materialmen would join and put up the house and divide the loss, or profits if there were any. I didn't have any talk about dividing the loss. We never go into a proposition like that if there is a loss. We go into that first. Mr. Speck didn't explain to me how we would lose fifty or a hundred dollars. I knew it was a 'home beautiful' project. There had been some of them in our city and we allow a manager to spend money for advertising purposes, and Mr. Speck said that was what he was charging the $50 or $100 to. Nothing was said by either Mr. Speck or me about the 'home beautiful' being a joint venture. It is the general practice and custom among lumber companies not to give their local manager power to waive liens."

It is contended by the appellant that there was no evidence to

show that the lumber company was one of the coöperators or associated with the other materialmen in this project as the court found. We have no difficulty in finding from the evidence of the two representatives of the company alone ample evidence to sustain the finding in this respect. The general manager, after being told that it was an advertising scheme in connection with the building of a "home beautiful," where the promoters wanted the company to furnish the lumber on the cost-plus basis that might cost them as much as $100, told the local manager, "We do not like to take the chance, but we would back his judgment and he could go along with it if he liked." He further said he knew it was a "home beautiful" project and that there were some of them in Kansas City, and "we allowed our men to spend money for advertising purposes." The attitude of the local manager presents an anomalous situation in that he, as local manager of the lumber company, was approached by the promoters of the project and requested to furnish the lumber needed therefor. He met with representatives of other parties who were requested to furnish other material for the building, was elected chairman of the group of materialmen, later was elected trustee to own and hold the title to the property, and then as trustee for all of the materialmen except the lumber company, agreed to purchase from himself as local manager of the lumber company the necessary lumber for the building. When, where and how he excluded, from the group of which he was chairman and trustee, the only company which he in the first place represented is not shown nor suggested. His attitude compels the conclusion that the other nine materialmen in the group did not want a chairman or trustee from their own number or one entitled to meet with them, but one who represented the only party requested to help with the project which did not or would not become one of the group.

Without resorting to the testimony of any other witness, we conclude there was sufficient evidence to support the finding that the Long-Bell Lumber Company was a member of the group.

But appellant insists it would be impossible and illegal for it, being a foreign corporation, to become a member of a partnership under any circumstances, and certainly without an authorization of its board of directors, citing eminent authorities. Among others is volume 2, Fletcher's Cyclopedia Corporations, section 841, which after stating the general rule to that effect modifies it with many statements like the following:

"However, a corporation may enter into a joint venture with an individual, where the nature of the contract is in line with the business its charter authorizes." (p. 1802.)

"Whether an agreement actually constitutes a partnership is to be determined by the general rules relating to partnerships, which are the same when a corporation is a partner as when all the partners are individuals. Of course, mere business relations between corporations, or between a corporation and an individual, do not necessarily involve the corporation in the partnership relation." (p. 1804.)

"Nor does it apply so as to prevent the law from imposing upon a corporation the liability of a partner as to third persons by reason of a contract made by it in furtherance of the objects of its creation, since the law may impose such a liability, not only when there was no intention to become a partner, but also when no contract of partnership could have been made." (p. 1805.)

Appellant assumes this group relation of these coöperators amounted to a partnership, which is very doubtful, but not necessary to be determined here. From the testimony as well as the findings of the court there existed no financial obligation of one coöperator to another; there was no liability for losses other than the value of the material contributed; they acted through a common trustee who spoke and acted for all, and there was nothing whatever to indicate that any one of them could bind the others.

Appellant concedes that this case differs only from the recently decided case of *Amsden Lumber Co. v. Arnspiger*, 129 Kan. 143, 281 Pac. 931, in that the Long-Bell Lumber Company is not admittedly one of the coöperators, and that it is here acting through a local manager. These distinctions depend upon proof and are purely questions of fact, and our approval of the finding of the trial court that the Long-Bell Lumber Company was one of the group of coöperators, puts this case exactly in the same position as the case cited, so far as the application of the law is concerned, and when by the findings of fact in this case the lumber company is placed in the same position as the lumber company in that case was admittedly, the same legal conclusion must necessarily follow, that the Long-Bell Lumber Company had no right to a mechanic's lien in this case.

The judgment is affirmed.